per curiam:
Nos corresponde evaluar el comportamiento del exjuez Roberto García Vega, a quien se le imputaron infracciones a los Cánones de Ética Judicial. Esas imputa-ciones tienen su génesis en el procedimiento disciplinario AD-2011-3. En específico, al entonces juez se le atribuye-ron transgresiones a los Cánones 1, 3, 23 y 30 de Ética Judicial, 4 LPRAAp. IV-B.
Durante el trámite del proceso disciplinario, el licen-ciado García Vega renunció a su cargo de Juez Superior. Así pues, el asunto que tenemos ante nuestra considera-ción es analizar si las actuaciones del licenciado García Vega en el desempeño de su cargo como juez, generaron violaciones al Código de Ética Profesional.
*744 I
El Ledo. Roberto L. García Vega juramentó el 18 de no-viembre de 2009 al cargo de Juez Superior. Comenzó a rea-lizar sus funciones en el Tribunal de Primera Instancia, Sala de Utuado.
El viernes, 28 de enero de 2011, en horas de la noche, el licenciado García Vega conducía su auto marca Toyota Ya-ris color blanco de 2010. Lo acompañaba la Leda. Lizette Meléndez a quien buscó esa noche en un condominio en Hato Rey. Mientras el licenciado García Vega transitaba en dirección de Hato Rey a Santurce, dobló a la izquierda en la avenida Roberto H. Todd. Cuando llegó a un semáforo que tenía la luz roja detuvo el vehículo. En ese momento, alrededor de las 11:15 p. m., transitaba por el carril dere-cho de la avenida Roberto H. Todd en dirección a la ave-nida Kennedy, pues iba a llevar a la licenciada Meléndez a recoger su vehículo que estaba estacionado en el Tribunal de Primera Instancia, Sala de Bayamón. Detrás del auto del licenciado García Vega había un auto compacto y luego una guagua alta, donde estaban las Sras. Zamarys Rodrí-guez Suárez y Shala Andújar Santos. Antes de que el se-máforo con luz roja cambiara a luz verde, el licenciado Gar-cía Vega emprendió la marcha.
Esa misma noche, la enfermera Luciana Genao salió de trabajar a las 11:00 p. m. de su trabajo en el edificio Caribbean Tower en Miramar. Salió del edificio, abordó su vehículo Mitsubishi Montero Sport de 1999 e inició la marcha hacia su residencia, ubicada en la urbanización Villas de Caney, en Trujillo Alto. La señora Genao transitaba por el carril derecho de la avenida Fernández Juncos y se detuvo ante el semáforo que interseca con la avenida Roberto H. Todd, pues la luz estaba roja. Al cambiar la luz a verde, la señora Genao prosiguió la marcha. En tanto, el licenciado García Vega inició la marcha con la luz roja e impactó la guagua de la señora Genao por el lado del conductor.
*745 Al recibir el impacto, la señora Genao pensó que "iba a morir”. El guía de su guagua se rompió, el vehículo perdió control, comenzó a moverse de forma zigzagueante, dio va-rias vueltas, se trepó en la acera y pasó entre un árbol y un poste de luz. Finalmente, el vehículo de la señora Genao impactó un poste de señal de tránsito que estaba en el carril exclusivo de la Autoridad Metropolitana de Autobu-ses y se estrelló en la vitrina del local Makro hasta termi-nar en su interior. La señora Genao perdió el conocimiento.
En el momento en que ocurrió el incidente, el agente Angel Vélez Rosado se encontraba junto con el agente Ro-dríguez Ñeco frente a la Pizzeria la Putanesca, en la Pa-rada Núm. 18 en Santurce. En particular, orientaban a un ciudadano sobre qué hacer respecto a un acto de vanda-lismo que ocurrió en el lugar. Mientras dialogaban con el ciudadano, se escuchó un frenazo. El agente Vélez Rosado se viró, vio el impacto y observó que el carro que conducía el licenciado García Vega se detuvo y dio la impresión de que iba a estacionarse en la Farmacia Walgreens, que es-taba cerca. No obstante, el auto no se detuvo y prosiguió la marcha. En ese momento el agente Vélez Rosado comenzó a perseguir el auto del licenciado García Vega. Por su parte, la señora Rodríguez Suárez también observó que el vehículo no se detuvo y decidió seguirlo para anotar el nú-mero de la tablilla.
El agente Vélez Rosado le indicó con gestos al licenciado García Vega que se parara, ya que su motora no tenía si-rena, aunque sí estaba identificada como un vehículo ofi-cial de la Policía. El entonces juez García Vega siguió la marcha y atravesó dos semáforos con luz roja. Segundos después el agente Vélez Rosado alcanzó el vehículo, se paró a su lado izquierdo y ordenó al licenciado García Vega que se detuviera. Este último se estacionó en la estación de gasolina Shell de la calle Labra, intersección con la calle Nueva Palma, seis cuadras después del lugar de la colisión. De esa forma, el licenciado García Vega rebasó las *746 calles Torre de la Vega, Corchado, Las Palmas, Progreso, Valencia y Nueva Palma antes de detenerse. La señora Ro-dríguez Suárez también detuvo su guagua en el garaje Shell, a veinte pies del vehículo del licenciado García Vega.
El agente Vélez Rosado le preguntó al licenciado García Vega “si él se había percatado de que había ocasionado un accidente”. Este contestó en la afirmativa. El agente le dijo que no se estacionó en el lugar del accidente. El licenciado García Vega le contestó que se iba a estacionar. De modo irónico, el agente Vélez Rosado le cuestionó “si se iba a estacionar en la casa ya que desde el lugar del accidente a donde yo pude intervenir en ese lapso de distancia había mucho espacio para estacionarse”. Durante su testimonio el agente indicó que el licenciado García Vega podía esta-cionarse al lado de la Farmacia Walgreens, o en el puesto de gasolina Texaco que se encuentra frente a la farmacia. La señora Rodríguez Suárez también se bajó indignada de su vehículo y le cuestionó “es increíble, usted no se iba a parar, o sea, acaba de ocasionar un accidente”. El licen-ciado García Vega respondió “mala mía”.
El agente Vélez Rosado testificó que al detener el vehí-culo observó que en el lado izquierdo del guía había unas latas de cervezas. También le preguntó al licenciado García Vega si había ingerido bebidas alcohólicas, a lo que con-testó que sí. Sin embargo, el agente no pudo especificar si las latas de cervezas estaban frías o calientes. El agente Vélez Rosado desconocía que el licenciado García Vega era juez y que su acompañante era abogada. Se enteró más de un año después.
Mientras tanto, la señora Genao recobró el conocimiento al sentir que se asfixiaba, ya que entraba humo en la guagua. De lejos escuchaba voces que le preguntaban: “¿Estás sola, puedes salir?” Trató de abrir la puerta del auto pero no pudo porque estaban cayendo muchos crista-les de la vitrina del local de Makro y de su guagua, así que se quedó pillada. Al llegar los paramédicos le ayudaron a *747 salir, mientras ella temblaba y sentía mucho miedo. El agente Edwin Medina Rosado auxiliaba al personal de emergencias médicas para sacar a la señora Genao del ve-hículo cuando recibió un mensaje por radio del sargento Ortiz indicándole que pasara más adelante, como a siete calles, porque tenían a “la otra parte del accidente”.
A las 11:30 p. m. el agente Medina Rosado llegó a la estación de gasolina Shell donde se encontraban el licen-ciado García Vega, el agente Vélez Rosado y el sargento Ortiz. El último dio instrucciones al agente Medina Rosado para que investigara el accidente. El agente Vélez Rosado se retiró del lugar y las señoras Rodríguez Suárez y Andú-jar Santos permanecieron observando.
El agente Medina Rosado solicitó al licenciado García Vega que saliera del vehículo para entrevistarlo y le soli-citó su documentación. Testificó que en ese momento per-cibió en el vehículo unas latas de cerveza Medalla en el portavasos. Cuando el agente Medina Rosado entrevistó al licenciado García Vega, percibió un fuerte olor a alcohol, por lo que le dijo que tenía motivos fundados para some-terlo a una prueba de alcohol. Luego de leerle las adverten-cias de rigor, lo arrestó. El agente Medina Rosado no en-trevistó a la licenciada Meléndez porque ella no “era parte de la investigación”. Aun así, ella se acercó al agente Medina Rosado y adujo que las latas de cervezas eran suyas y no del licenciado García Vega.
Acto seguido, montó al licenciado García Vega en la pa-trulla para transportarlo a la División de Tránsito, Sección de Patrullas y Carreteras, donde se realizaría la prueba de alcohol. En el garaje Shell permanecieron el sargento Ortiz junto a otros policías, las señoras Rodríguez Suárez, Andú-jar Santos y la licenciada Meléndez, a quien el licenciado García Vega le entregó las llaves de su vehículo.
El agente Medina Rosado llevó al licenciado García Vega a la División de Tránsito ubicada detrás del Cuartel de la Policía de la Calle Eleanor Roosevelt. Durante el tra-yecto el licenciado García Vega expresó que deseaba some- *748 terse a la prueba de sangre. Una vez llegaron a la División de Tránsito le informaron que no había envases para rea-lizar esa prueba. El agente Medina Rosado decidió hacer la prueba de aliento, pero el licenciado García Vega se negó y no se sentó en el área para hacer la prueba ni sopló en la máquina Intoxilyzer. Sobre esa situación, el agente Medina Rosado testificó que desconocía que podía llevar al licen-ciado García Vega a un hospital para hacerle la prueba o ante un magistrado para que se ordenara la prueba de aliento. Admitió que nunca había trabajado con pruebas de sangre.
Sin duda la investigación realizada por la Policía fue deficiente. No se sacaron fotos del vehículo ni se confiscó. No se emitió una multa al licenciado García Vega por pasar la luz roja del semáforo. Tampoco se expidieron boletos por tener envases abiertos de bebidas alcohólicas en el vehí-culo (Art. 7.01 de la Ley Núm. 22-2000, conocida como la Ley de Vehículos y Tránsito de Puerto Rico, 9 LPRA see. 5201) ni se confiscaron las latas de cerveza.
Mientras estaban en la División de Tránsito, el licen-ciado García Vega mencionó al agente Medina Rosado que era juez. El agente Medina Rosado testificó:
[M]e enteré en la entrevista que le hice al caballero [...] parte cuando él me menciona su empleo pues me pide cierta consi-deración [...] Yo le dije pues mi trato va a ser independiente-mente el mismo tal y cual trato a todo el mundo. Fuera de eso nosotros no teníamos ningún problema, incluso cuando se so-licitó la cita nosotros nos sentamos y de acuerdo al Schedule de él fue que se le dio una fecha. Informe final de la Comisión de Disciplina Judicial, pág. 7.
Añadió el agente que para citarlo inicialmente le dio una fecha, pero el entonces juez García Vega la rechazó porque en ese día tenía que atender su sala en el tribunal. Finalmente se dejó ir al licenciado, quien fue recogido por la licenciada Meléndez en el vehículo Toyota Yaris chocado.
En la madrugada del sábado, 29 de enero de 2011, el licenciado García Vega y la licenciada Meléndez acudieron *749 al Centro de Diagnóstico y Tratamiento (CDT) de la calle Hoare, donde convalecía la señora Genao. Allí preguntaron por la condición de esta última y hablaron con el médico que la atendía. También se comunicaron directamente con la señora Genao, quien estaba acostada en una cama y sufría mucho dolor. El licenciado García Vega se identificó como la persona involucrada en el accidente con ella. La señora Genao le dio tres números telefónicos de contacto y su dirección residencial. También le comentó que su hijo la buscaría al CDT.
El agente Medina Rosado también acudió al CDT a en-trevistar a la señora Genao. Allí habló con el médico y tomó los datos que entendió necesarios para preparar su informe. Luego lo completó y dejó en blanco el encasillado que proveía para especificar la ocupación del licenciado García Vega. Al momento de rendir el informe no había entrevistado a las señoras Rodríguez Suárez y Andújar Santos.
Entre las 9:00 a. m. y 10:00 a. m. del día después del accidente, la señora Genao fue dada de alta médica y su hijo menor fue a recogerla. En el CDT le hicieron varios exámenes, le inyectaron medicamentos y le dieron un refe-rido médico. Como consecuencia del accidente tuvo golpes, abrasiones, así como laceraciones en la espalda, la cara, el tobillo y otras partes del cuerpo. No tuvo fracturas.
Entre las 2:00 p. m. y 2:30 p. m. de ese mismo día, el licenciado García Vega y la licenciada Meléndez fueron a la residencia de la señora Genao. Allí vieron los daños del vehículo y el licenciado García Vega ofreció llevarlo a un hojalatero para que lo arreglara.
Al día siguiente el licenciado García Vega y la licenciada Meléndez volvieron a la residencia de la señora Genao en compañía de un hojalatero. Se inspeccionó el auto. El hoja-latero concluyó que era pérdida total. Entonces, el licenciado García Vega indicó a la señora Genao que podían acudir al Seguro Compulsorio para tratar de solucionar la situación.
*750 Uno o dos meses después del accidente, pero antes de ir al Seguro Compulsorio, la señora Genao se enteró de que el licenciado García Vega era juez porque su esposo se lo dijo luego de recibir una llamada telefónica citándola para que un fiscal la entrevistara. La persona que llamó a la casa de la señora Genao informó que el licenciado García Vega era un “funcionario del gobierno”.
Posteriormente la señora Genao y el licenciado García Vega acudieron al Seguro Compulsorio. Esa oficina, me-diante una fórmula, le otorgó a la señora Genao de $3,500, suma menor al valor del auto. Ante esa situación, la señora Genao le reclamó al licenciado García Vega que el vehículo costaba más de la cantidad que le había dado el Seguro Compulsorio. El licenciado García Vega se ofreció a pagarle la diferencia para completar el valor del auto, unos $5,000. La señora Genao se quedó con el auto que, según el licen-ciado García Vega, conservaba piezas en buen estado.
Varios meses después del accidente el licenciado García Vega y la licenciada Meléndez acudieron por tercera vez a la residencia de la señora Genao. En esa ocasión la licen-ciada Meléndez le expresó a la señora Genao que “yo soy abogada y él es juez”. Luego el licenciado García Vega le entregó $1,800 en efectivo, la diferencia entre el valor del vehículo y el pago del Seguro Compulsorio. Esa cantidad superaba la suma total del vehículo, así como los gastos de grúa y otros relacionados. Además, se llevó un recibo para la firma de la señora Genao. La licenciada Meléndez en-tregó el recibo a la señora Genao para que lo firmara y le preguntó si ella o su esposo lo querían leer. Su esposo dijo que no y la señora Genao tampoco lo leyó, según ella, por-que su esposo tiene 81 años y ella no estaba en condiciones de leer. También estaba su hijo, quien tampoco leyó el documento. Entonces, la licenciada Meléndez leyó en voz alta el recibo que especificaba que la señora Genao renun-ciaba a reclamaciones civiles y criminales por causa del accidente. La señora Genao firmó el recibo y lo fotocopió en una máquina que tenía en su casa.
*751 La señora Genao recibió tratamiento médico y psiquiá-trico a través de la ACAA. Testificó que ya no puede des-empeñarse como enfermera práctica por los dolores y es-pasmos que sufre.
En el caso penal contra el licenciado García Vega se de-terminó causa probable para arresto por violación a los Arts. 4.02, 5.07, 7.02 y 7.05 de la Ley Núm. 22-2000, 9 LPRA secs. 5102, 5128, 5202, 5205. A raíz de esa determi-nación se emitió una orden administrativa en la que se suspendió al licenciado García Vega de sus funciones judiciales. También se autorizó el inicio de una investiga-ción administrativa sobre posible conducta antiética.
El 23 de septiembre de 2011, luego de recopilar la prueba y con el beneficio de la comparecencia del licen-ciado García Vega, la Oficina de Administración de los Tribunales (OAT) presentó un Informe de Investigación. El 11 de octubre de 2011 la comisionada asociada Delia Lugo Bougal, determinó la existencia de causa probable para au-torizar la continuación de los procedimientos.
La OAT presentó una querella contra el licenciado Gar-cía Vega imputándole violaciones a los Cánones 1, 3, 23 y 30 de Etica Judicial, supra. En específico, en el primer cargo se le atribuyó al licenciado García Vega incurrir en conducta impropia al provocar un accidente automovilís-tico en el que resultó herida una persona y en el que hubo daños a la propiedad ajena, y luego abandonar apresura-damente el lugar en vez de detenerse. Asimismo, se le im-putó en el segundo cargo incurrir en conducta indebida al manejar su vehículo de motor bajo los efectos de bebidas embriagantes, provocando el accidente en cuestión. Por úl-timo, en el tercer cargo se le atribuyó al licenciado García Vega utilizar la autoridad y prestigio de su cargo como juez para influir indebidamente al solicitar un trato favorable por parte de la Policía de Puerto Rico y hacer que la señora Genao firmara un relevo de responsabilidad tanto en el ámbito penal como en el civil.
*752 El 12 de diciembre de 2011 el licenciado García Vega solicitó la paralización del procedimiento disciplinario hasta que culminara el procedimiento penal que corría de forma paralela. La OAT se opuso a esa solicitud. La Comi-sión de Disciplina Judicial denegó la paralización. El 3 de enero de 2012 el licenciado García Vega contestó la quere-lla y negó todas las alegaciones como mecanismo para “pre-servar los derechos fundamentales del juez querellado mientras estén vigentes las denuncias criminales”. La Co-misión de Disciplina Judicial señaló la fecha para una vista evidenciaría y obligó a las partes a que se reunieran. El 7 de febrero de 2012 el licenciado García Vega volvió a solicitar la paralización del proceso disciplinario. La OAT se volvió a oponer al pedido y la Comisión de Disciplina Judicial denegó nuevamente la paralización.
El 14 de marzo de 2013 se suspendió el proceso por mo-tivos de salud de la representación legal del licenciado Gar-cía Vega. La Comisión concedió más tiempo para la presen-tación del informe de conferencia entre abogados y pautó la vista para el 30 de mayo de 2012.
El 23 de abril de 2012 se presentó una tercera moción para paralizar el procedimiento, que se declaró “no ha lugar”. El 9 de mayo de 2012 se presentó el informe de conferencia con antelación a la vista.
Inconforme con la denegación de la paralización del pro-ceso, el licenciado García Vega acudió ante este Tribunal mediante una moción en auxilio de jurisdicción y solicitud de orden provisional en la que pidió la interrupción del procedimiento. El 18 de mayo de 2012 declaramos esa mo-ción “no ha lugar”.
Luego de varios incidentes, el licenciado García Vega presentó una cuarta solicitud de paralización del procedi-miento disciplinario, a la luz de lo resuelto por este Foro en Pueblo v. García Vega, 186 DPR 592 (2012). En ese caso resolvimos que un referido a la División de Integridad Pú-blica del Departamento de Justicia para que ausculte si procede la designación de un Fiscal Especial Indepen- *753 diente, constituye justa causa para prorrogar los términos de juicio rápido, por lo que no procedía la desestimación de los cargos penales contra el licenciado García Vega. La Co-misión de Disciplina Judicial no autorizó la paralización.
Luego de que la Comisión celebrara las vistas evidencia-rías correspondientes, las partes presentaron sendos me-morandos de derecho con sus planteamientos finales. En esencia, la OAT sostiene que el licenciado García Vega abandonó el lugar luego de ocasionar el accidente, bajo los efectos de bebidas alcohólicas y que utilizó su posición como juez para influir al agente Vélez Rosado y la señora Genao. Por su parte, el licenciado García Vega sostuvo que no se probaron los cargos con el quantum de prueba requerido. Negó que se haya ido a la fuga y sostuvo que no se detuvo en el momento porque quería encontrar un lugar seguro para estacionarse. Además, indicó que no acostum-braba ingerir bebidas alcohólicas. También impugnó la in-tervención policiaca y cuestionó la existencia de las latas de cerveza. En cuanto al tercer cargo expresó que nunca intentó influenciar de forma indebida a la señora Genao ni al agente Vélez Rosado. Asimismo, sostiene que con su con-ducta no violentó su deber de conducirse de forma ética y respetuosa con todas las personas con que tuvo que comu-nicarse durante el proceso.
Así, el caso quedó sometido en los méritos para que la Comisión de Disciplina Judicial emitiera su recomendación. Esa Comisión formuló su informe el 19 de abril de 2013. Se concluyó por unanimidad de los comisionados que el licen-ciado García Vega incurrió en la conducta imputada en el primer cargo, violando los Cánones 1, 3 y 23 de Etica Judicial, supra, al provocar un accidente automovilístico, causar daños e irse a la fuga. Hubo discrepancia en cuanto a los cargos segundo y tercero en los cuales se le imputó al licen-ciado García Vega manejar su vehículo bajo los efectos de bebidas embriagantes y utilizar la autoridad y prestigio de su cargo como juez para solicitar un trato favorable por parte de la policía e influir en la víctima del accidente para *754 que firmara un relevo de responsabilidad. Los comisionados Aida Molinary de la Cruz, Juan Salgado Morales y Carmen Sierra Corredor sostienen que esos dos cargos quedaron probados. Por su parte, los comisionados Evelyn Benvenutti Toro, José Miranda de Hostos y Lourdes Velázquez Cajigas concluyeron que la O AT no probó esos cargos.
También hubo discrepancia en cuanto a la sanción a imponerse. Los comisionados Molinary de la Cruz, Salgado Morales, Sierra Corredor y Benvenutti Toro recomendaron como sanción la destitución del licenciado García Vega de su cargo de juez superior. Por otro lado, los comisionados Miranda de Hostos y Velázquez Cajigas recomendaron como sanción una suspensión de empleo y sueldo por el término de seis meses.
Mientras este Foro deliberaba sobre el asunto, el licen-ciado García Vega renunció a su cargo de Juez Superior y el Gobernador de Puerto Rico, Hon. Alejandro García Padilla, le aceptó la renuncia. A la luz de ello, emitimos una resolución en la que ordenamos al licenciado García Vega que mostrara causa por la cual su conducta no debía ser sancionada al amparo del Código de Ética Profesional, 4 LPRAAp. IX. Nuestra orden se cumplió.
Luego de evaluar el expediente, estamos en posición de resolver.
II
En In re Ríos Ríos, 175 DPR 57, 75 (2008), sostuvimos que “los abogados tienen un interés propietario en el ejercicio de la profesión legal”. En consecuencia, los abogados son acreedores de las garantías que ofrece el debido proceso de ley en su vertiente procesal en aquellos procedimientos disciplinarios en que esté en juego su título. In re Ruffalo, 390 US 544, 550 (1968).
No obstante, es necesario tener presente cuál es el proceso debido. En específico, mencionamos en Rivera Rodríguez & Co. v. Lee Stowell, etc., 133 DPR 881, 887-888 *755 (1993) que “el debido proceso de ley procesal [...] le impone al Estado la obligación de garantizar que la interferencia con los intereses de libertad y propiedad del individuo se haga a través de un procedimiento que sea justo y equitativo”. Es decir, el debido proceso de ley es pragmático y “debe ser fundamentalmente justo al individuo en la re-solución de los hechos y derechos que sirven de base para aquellas acciones gubernamentales que le privan de su vida, libertad o propiedad”. Rivera Santiago v. Srio. de Hacienda, 119 DPR 265, 274 (1987).
Por otro lado, resolvimos en In re Pérez Riveiro, 180 DPR 193, 200 (2010), que el debido proceso de ley que hay que conferir a los abogados en el proceso disciplinario “se satisface siempre que se le provea al abogado querellado la oportunidad de responder y defenderse de los cargos imputados y notificados, así como de las teorías en las que se fundamenten”. Específicamente, en In re Martínez Almodóvar, 180 DPR 805, 825-826 (2011), mencionamos que,
[...] a modo de excepción, en las instancias en donde el ex-pediente ante la consideración del Tribunal refleje que, en cuanto a la conducta impropia adicional, se le han salvaguar-dado al querellado todas las garantías que emanan del debido proceso de ley, el Tribunal podrá —si lo estima apropiado— evaluar y atender esta conducta adicional en el mismo proce-dimiento disciplinario, sin necesidad de referirla al procurador general. Sólo así protegeremos efectivamente las garantías constitucionales del abogado querellado y no se menoscabará su oportunidad de preparar adecuadamente su defensa ni se le impedirá velar por su sustento.
Recientemente, en In re Rodríguez Plaza, 182 DPR 328 (2011), atendimos una situación procesal casi idéntica a la que nos ocupa. Allí la querellada Rodríguez Plaza también renunció a su cargo de juez luego de que la Comisión de Disciplina Judicial emitiera su informe con relación a unas querellas que la Oficina de Administración de los Tribuna- *756 les le había presentado. En ese caso disciplinamos a la licenciada Rodríguez Plaza por quebrantar el Canon 38 del Código de Ética Profesional, 4 LPRA Ap. IX, aunque la querella imputó violación de los Cánones 4, 8, 9, 13, 14 y 33 de Ética Judicial, 4 LPRA Ap. IV-B.
En el caso ante nuestra consideración, al igual que en In re Rodríguez Plaza, supra, no se enmienda la querella para añadir hechos nuevos. Sencillamente, debemos disciplinar al licenciado García Vega al amparo del Código de Ética Profesional y no del Código de Ética Judicial porque renunció a su cargo como juez. Además, el querellado tuvo am-plia oportunidad de presentar prueba y refutar la que presentó la Administración de Tribunales. En palabras del Tribunal Supremo federal, nuestra actuación de disciplinar al licenciado García Vega al amparo del Código de Ética Profesional no constituye una “trampa” para enmendar la querella sin previo aviso al abogado. Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio, 471 US 626, 655 esc. 18 (1985), citando a In re Ruffalo, supra, pág. 551 esc. 4.
De igual forma, la Regia 33 de Disciplina Judicial establece que “[l]a renuncia o la expiración del término del nombramiento de la jueza o del juez querellado no impedirá que continúe el procedimiento disciplinario en su contra al amparo de este reglamento. La Comisión determinará si la conducta amerita la recomendación de imponerle a la jueza o al juez querellado medidas disciplinarias por violación al Código de Ética Profesional”. 4 LPRA Ap. XV-B. Así pues, reiteramos que “la renuncia de un miembro de la Judicatura o el vencimiento de su término no impide la continuación de un procedimiento disciplinario en su contra, siempre que la alegada conducta impropia pueda dar lugar [a una sanción disciplinaria]”. In re Santiago Rodríguez, 160 DPR 245, 253 (2003).
*757 III
El Canon 38 del Código de Ética Profesional, supra, en lo concerniente, dispone:
El abogado deberá esforzarse, al máximo de su capacidad, en la exaltación del honor y dignidad de su profesión, aunque el así hacerlo conlleve sacrificios personales y debe evitar hasta la apariencia de conducta profesional impropia. En su conducta como funcionario del tribunal, deberá interesarse en hacer su propia y cabal aportación hacia la consecución de una mejor administración de la justicia. [...]
Por razón de la confianza en él depositada como miembro de la ilustre profesión legal, todo abogado, tanto en su vida pri-vada como en el desempeño de su profesión, debe conducirse en forma digna y honorable.
En consecuencia, un abogado que no se conduce digna y honorablemente viola el Canon 38 del Código de Ética Profesional, supra. In re Hernández Vázquez, 180 DPR 527, 541 (2010); In re Roldán Figueroa, 106 DPR 4, 12 (1977). Recordemos que los abogados están obligados a evitar la conducta impropia en su vida profesional y personal, tanto en la realidad como en la apariencia. In re Cotto Luna, 187 DPR 584 (2012); In re Peña, Santiago, 185 DPR 764, 781 (2012). De lo contrario, podrían enfrentar la suspensión o desaforo del ejercicio de la profesión. In re Campoamor Redín, 150 DPR 138, 153 (2000).
En ese sentido, hemos reiterado que los abogados son el espejo donde se refleja la imagen de la profesión. In re Fontánez Fontánez, 181 DPR 407, 417 (2011). Por esa razón, “deben actuar con el más escrupuloso sentido de responsabilidad que impone la función social que ejercen”. In re Nieves Nieves, 181 DPR 25, 45 (2011). Véase, además, In re Cuyar Fernández, 163 DPR 113, 117 (2004).
En nuestra jurisprudencia existen varios precedentes en los que hemos disciplinado a abogados por su conducta como jueces. Por ejemplo, en In re Liceaga, 82 DPR 252 (1961), desaforamos permanentemente a un abogado por- *758 que en su desempeño como juez sentenció e impuso multas y costas a varias personas en vistas para determinación de causa probable sin que se hubiese presentado una denuncia. Concluimos que el juez se apropió ilegalmente de de $577.25. Al actuar de esa forma, expresamos que la conducta del entonces juez José Antonio Liceaga “tiende a desacreditar el concepto del público de la justicia y a me-nospreciar las condiciones morales que debe reunir todo abogado”. íd., pág. 259. Ese estándar que usamos para me-dir la actuación del entonces juez Liceaga es muy similar a la apariencia de conducta impropia que contiene el Canon 38 del Código de Ética Profesional, supra.
Por su parte, en In re Santiago Rodríguez, supra, disci-plinamos a la Leda. Elba Santiago Rodríguez porque como juez discriminó por razón de género contra las mujeres víc-timas de violencia doméstica que acudían a su sala a bus-car órdenes de protección. En particular, utilizamos el Canon 38 del Código de Ética Profesional, supra, y no los Cánones de Ética Judicial debido a que la licenciada Santiago Rodríguez había renunciado a su cargo como juez. Determinamos entonces que “las expresiones discriminato-rias de la licenciada Santiago Rodríguez hacia las mujeres víctimas de violencia doméstica se apartaron de la con-ducta digna y honorable que exige el Canon 38 del Código de Ética Profesional, supra”. Id., pág. 255.
Por otro lado, en In re Suárez Marchán, 159 DPR 724 (2003), censuramos enérgicamente a un abogado que en su desempeño como juez participó y decidió varios asuntos procesales de un caso de alimentos en el que las partes eran amigas suyas. Además, durante el trámite del caso, recomendó a una de las partes que contratara a cierto abogado. Por último, el juez mantuvo comunicación pri-vada con una de las partes. Todo eso fue una clara viola-ción de los Cánones de Ética Judicial. Sin embargo, como el licenciado Suárez Marchán ya no era juez, lo disciplinamos *759 al amparo de los cánones del Código de Ética Profesional. En específico, mencionamos que
[l]a conducta del licenciado Suárez Marchán dista mucho de exaltar el honor de la profesión legal. Por el contrario, sus actuaciones en todo tiempo aparentaron estar encaminadas a beneficiar, desde su posición como Juez Superior, a la señora Cruz Negrón y de utilizar su cargo para alterar el adecuado funcionamiento del sistema judicial. íd., pág. 745.
Por último, en In re Rodríguez Plaza, supra, pág. 346, resolvimos que la licenciada Rodríguez Plaza infringió el Canon 38 del Código de Ética Profesional, supra, al exhibir una conducta indigna, ya que utilizó el poder de su cargo judicial para vejar a compañeros abogados y al público en general. En vista de que la licenciada Rodríguez Plaza te-nía un historial profesional inmaculado, limitamos nuestra sanción a una censura enérgica.
En el caso que nos ocupa quedó establecido que el en-tonces juez García Vega provocó el accidente de tránsito en cuestión. Eso de por sí no constituye una falta ética. Sin embargo, también se probó que luego de ocurrir el inci-dente, el licenciado García Vega se dio a la fuga. Tres tes-tigos oculares (agente Vélez Rosado y las señoras Rodrí-guez Suárez y Andújar Santos) presenciaron la huida del entonces juez y lo persiguieron hasta lograr que se detu-viera seis calles adelante. Con esa actuación, el licenciado García Vega quebrantó el Canon 38 del Código de Ética Profesional, supra. Tomamos conocimiento judicial de que el licenciado García Vega resultó culpable de quebrantar los Arts. 4.02 (no detener un vehículo involucrado en un accidente de tránsito) y 5.07 (conducir un vehículo de forma imprudente o negligentemente temeraria) de la Ley Núm. 22-2000, supra.
Por su parte, concluimos que la conducta del licenciado García Vega de usar la autoridad y prestigio de su cargo judicial para solicitar un trato favorable por parte de la *760 Policía e influir en la víctima del accidente para que ella firmara un relevo de responsabilidad, excedió los contornos éticos que regulan la profesión legal. Canon 38 del Código de Ética Profesional, supra. El agente Medina Rosado tes-tificó con claridad que el entonces juez García Vega le pidió consideración en razón de su empleo. Informe final de la Comisión de Disciplina Judicial, pág. 7. También surge del expediente que la tercera vez que el licenciado García Vega acudió a la casa de la señora Genao le hizo firmar un relevo de responsabilidad en un ambiente totalmente inadecuado. Nótese que no se le dio oportunidad a la señora Genao para que consultara con un abogado sobre la conveniencia de firmar el relevo.(1) No es antiético realizar ofertas de tran-sacción de posibles reclamaciones civiles. Sin embargo, esa gestión no se puede llevar a cabo en un ambiente cargado en el cual, antes de hacerse la oferta, se le recuerda a la perjudicada, quien no está representada por un abogado, que el responsable de los daños “es juez” y la persona que lo acompaña es “abogada”.
Por último, al aplicar el criterio de prueba que el debido proceso de ley exige en estos casos disciplinarios, conclui-mos que no existe prueba clara, robusta y convincente en el expediente que nos permita concluir que el querellado manejó su auto bajo los efectos de bebidas embriagantes. In re Soto Charraire, 186 DPR 1019 (2012); In re Martínez Almodóvar, supra; In re Irizarry Vega, 176 DPR 241 (2009). De la prueba presentada por la OAT surge que los policías que investigaron el accidente no ocuparon las latas de cer-veza que observaron en el auto ni se expidieron multas administrativas. Tampoco se le hizo una prueba de alcohol al licenciado García Vega. En fin, la investigación realizada fue deficiente y no nos produce “una convicción duradera de que las contenciones fácticas son altamente probables”. In re Rodríguez Mercado, 165 DPR 630, 641 *761 (2005). Tomamos conocimiento judicial de que el licenciado García Vega no resultó culpable de quebrantar los Arts. 7.01 (conducir vehículo bajo los efectos de bebidas embria-gantes y poseer envase abierto con bebidas embriagantes) y 7.05 (causar daño corporal a una persona con un vehículo bajo los efectos de bebidas embriagantes) de la Ley Núm. 22-2000, supra.
Debemos considerar también el historial del querellado. Este es el primer incidente disciplinario en el que se ve involucrado, como abogado o como juez.
> H — i
Considerado todo lo anterior, ordenamos la suspensión inmediata del Ledo. Roberto García Vega de la práctica de la profesión por el término de dos años. El querellado tiene el deber de notificar a todos sus clientes de su inhabilidad para continuar con su representación y deberá devolver a éstos los expedientes de los casos pendientes, así como los honorarios recibidos por trabajos no rendidos. Además, tiene el deber de informar oportunamente de su suspensión a los foros judiciales y administrativos. Estas gestiones de-berán certificarse a este Tribunal dentro del término de treinta días a partir de la notificación de esta Opinión.
La OAT nos informa que presentó ante la Comisión de Disciplina Judicial un Informe de Investigación que se rea-lizó en torno a una supuesta conducta del licenciado García Vega por nuevos hechos íntimamente relacionados con el procedimiento disciplinario de epígrafe. Con ese informe se acompañan unas declaraciones juradas que pueden supo-ner el comienzo de otro procedimiento disciplinario contra el licenciado García Vega. En particular, se le imputa al licenciado García Vega tratar de influenciar a un miembro de la Comisión de Etica Judicial para que reconsiderara su voto en este procedimiento disciplinario.

*762
Se remite a la atención de la Procuradora General el Informe de Investigación que preparó la OATpor los hechos posteriores que están íntimamente relacionados con el pro-cedimiento disciplinario de epígrafe para que ausculte si procede presentar una querella ética. Esta encomienda de-berá realizarse con prontitud y mientras el licenciado Gar-cía Vega cumple los dos años de suspensión.

Se dictará sentencia de conformidad.

 No entraremos a dilucidar la validez del relevo de responsabilidad que firmó la señora Genao porque esa controversia no está ante nuestra consideración.